**UNITED STATES DISTRICT COURT**

**DISTRICT OF NEVADA**

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>            Plaintiff,<br>vs.<br><br>JOEY MCROYAL, et al.,<br><br>            Defendants. | Case No. 2:23-cr-00113-CDS-NJK<br><br>ORDER AND<br>REPORT AND RECOMMENDATION<br><br>(Docket Nos. 277, 280) |

This matter was referred to the undersigned Magistrate Judge on Defendant Joey McRoyal's motion to suppress evidence. Docket No. 277. The Court has considered Defendant's motion and exhibits, the United States' response, Defendant's reply, the evidence and arguments presented at an evidentiary hearing held before the Court, and the parties' subsequent briefing.[1] Docket Nos. 277, 282, 283, 301, 341, 345, 346, 351, 355.

Also pending before the Court is Defendant Paulina Hernandez's motion for joinder to Defendant McRoyal's motion to suppress. Docket No. 280. The Court has considered this motion, the United States' response, and Defendant's reply. Docket Nos. 280, 282, 294.

I.     **BACKGROUND**

A.   **Testimony of Agent Martinez**

Special Agent ("SA") Anthony Martinez has worked for the Drug Enforcement Agency ("DEA") in Las Vegas for three years and seven months. Docket No. 345 at 10. In August 2022,

---

[1]    While the Court allowed all parties who were at the evidentiary hearing to file supplemental briefing, only the United States and Defendant McRoyal did so. *See* Docket Nos. 351, 355.

the DEA started an investigation into a Las Vegas-based drug trafficking organization ("DTO"). *Id*. at 11, 18. Defendants McRoyal and Hernandez were two of the targets of this investigation. *Id*. at 12.

On August 22, 2022, an undercover DEA agent called Defendant McRoyal to purchase one-half pound of methamphetamine and recorded the telephone call. *Id*. at 18; Government Exhibit 1 (audio recording of phone call).[2] As a result of that phone call, on August 23, 2022, the DEA conducted a controlled buy of approximately one-half pound of methamphetamine from Defendant McRoyal in Las Vegas, Nevada. Docket No. 345 at 20. The undercover agent who made the buy video recorded it. *Id*. at 20-21; Government Exhibit 2 (video recording of controlled buy).

On September 21, 2022, the undercover agent again contacted Defendant McRoyal by telephone to arrange the purchase of one pound of methamphetamine and recorded the call. Docket No. 345 at 22; Government Exhibit 3 (audio recording of phone call). During this call, Defendant McRoyal referenced co-Defendant Lamar Rosser, who then called and texted the undercover agent in order to sell the undercover methamphetamine. Docket No. 345 at 23-25; Government Exhibits 4A through 4G (audio recordings of phone calls and text messages). On September 22, 2022, the undercover agent made a controlled purchase of one pound of methamphetamine from Defendant Rosser in Las Vegas, Nevada, which the agent video recorded. Docket No. 345 at 25-27; Government Exhibit 5 (video recording of controlled buy).

On October 24, 2022, the undercover agent called Defendant Rosser to arrange the purchase of one pound of methamphetamine and recorded the call. Docket No. 345 at 27;

---

[2] All exhibits cited in this report and recommendation are exhibits presented by the parties at the evidentiary hearing.

Government Exhibit 6 (audio recording of phone call). On October 25, 2022, the undercover agent made a controlled purchase of one pound of methamphetamine from Defendant Rosser in Las Vegas, Nevada, which the agent video recorded. Docket No. 345 at 27-29; Government Exhibit 7 (video recording of controlled buy).

The undercover agent began texting with Defendant Rosser to arrange the purchase of more methamphetamine. Docket No. 345 at 29; Government Exhibit 4C (text messages). On December 5, 2022, the undercover agent made a controlled purchase of one pound of methamphetamine from Defendant Rosser in Las Vegas, Nevada, which the agent audio recorded. Docket No. 345 at 29-31; Government Exhibit 8 (audio recording of controlled buy).

On January 26, 2023, the undercover agent called Defendant McRoyal to arrange the purchase of approximately 400 fentanyl pills and recorded the call. Docket No. 345 at 31; Government Exhibit 9 (audio recording of phone call). This purchase occurred on the same date, in Las Vegas, Nevada, with Defendant McRoyal selling approximately 400 fentanyl pills to the undercover agent, which the agent video recorded. Docket No. 345 at 31-32; Government Exhibit 10 (video recording of controlled buy).

On February 10, 2023, the DEA received judicial authorization for a wiretap for the phones used by Defendants McRoyal and Rosser. Docket No. 345 at 32-33; Docket No. 346 at 26-29, 32-34; Defense Exhibit 1 (T-III wiretap affidavit). On February 17, 2023, the DEA intercepted a phone call regarding drug trafficking between Defendants McRoyal and Hernandez, both of whose voices SA Martinez recognized. Docket No. 345 at 33-35; Government Exhibit 11 (audio recording of intercepted phone call). On the same date, the DEA intercepted a phone call between Defendant Rosser and a woman, whom SA Martinez believed to be Defendant

Hernandez, regarding drug trafficking.  Docket No. 345 at 35-36; Government Exhibit 12 (audio recording of intercepted phone call).

On February 20, 2023, the DEA intercepted a phone call between Defendant Rosser and an unidentified caller regarding drug trafficking.  Docket No. 345 at 36-37; Government Exhibit 13 (audio recording of intercepted phone call).  The call included a reference to an "eighth," which SA Martinez testified is an eighth of an ounce, or three and one-half grams of a narcotic.  Docket No. 345 at 37.  The call also included a reference to "crys," which SA Martinez testified is crystal methamphetamine.  *Id*.  On March 9, 2023, the DEA intercepted a phone call between Defendants McRoyal and Hernandez discussing drug trafficking.  *Id*. at 37-38; Government Exhibit 14 (audio recording of intercepted phone call).  This call included a reference to the term "blues," which SA Martinez testified is a common term referring to fentanyl pills or fentanyl-laced pills.  Docket No. 345 at 38.  On March 11, 2023, the DEA intercepted two phone calls between Defendants McRoyal and Hernandez discussing drug trafficking.  *Id*. at 38-39; Government Exhibits 15A, 15B (audio recordings of intercepted phone calls).

On March 10, 2023, an undercover Las Vegas Metropolitan Police Department ("LVMPD") detective called Defendant Hernandez to arrange the purchase of methamphetamine, and the detective recorded the call.  Docket No. 345 at 39-40; Government Exhibit 16 (audio recording of phone call).  This call included a reference to a "band," which SA Martinez testified is $1,000.  Docket No. 345 at 40.

On March 14, 2023, the DEA received judicial authorization for continued interception of the phones used by Defendants McRoyal and Rosser, as well as judicial authorization for interception of the phone used by Defendant Harris.  *Id*.  SA Martinez testified that, at that time,

agents believed Defendant Harris had a leadership role in the DTO and that he was responsible for providing additional drugs when the DTO ran low. *Id*. at 40-41; Docket No. 346 at 48, 57.

On March 15, 2023, a DEA task force officer called Defendant Hernandez to arrange for the purchase of one-half pound of methamphetamine and recorded the call. Docket No. 345 at 41-42; Government Exhibit 17A (audio recording of phone call). On March 16, 2023, a DEA task force officer called Defendant Hernandez to arrange for the purchase of one-half pound of methamphetamine and recorded the call. Docket No. 345 at 43; Government Exhibit 18 (audio recording of phone call). The parties agreed on a location to meet and, when the undercover agent arrived at that location, he called Defendant Hernandez and recorded the call. Docket No. 345 at 43-44; Government Exhibit 19 (audio recording of phone call). Defendant Hernandez arrived and sold the undercover agent one-half pound of methamphetamine, which the agent video recorded. Docket No. 345 at 44-45; Government Exhibit 21 (video recording of controlled buy).

On March 19, 2023, the DEA intercepted a phone call between Defendants McRoyal and Hernandez wherein they discussed drug trafficking. Docket No. 345 at 45; Government Exhibit 22 (audio recording of phone call). On March 23, 2023, the DEA intercepted a phone call between Defendants McRoyal and Hernandez wherein they discussed drug trafficking. Docket No. 345 at 45-46; Government Exhibit 23 (audio recording of phone call). During this call, the term "perc" was used, and SA Martinez testified that this term means the drug Percocet. Docket No. 345 at 46.

On March 23, 2023, an undercover DEA agent called Defendant McRoyal to purchase firearms and one pound of methamphetamine from him and recorded the call. Id. at 46-47; Government Exhibit 24A (recording of phone call).

On March 25 and 26, 2023, the DEA intercepted phone calls from Defendant Harris' phone that caused the agents to suspect that Defendant Harris was involved in trafficking narcotics across state lines. Docket No. 345 at 47; Docket No. 346 at 45-48, 49-52, 58. In some calls, Defendant Harris was speaking with a man about having a woman, Antoinette Clemons, fly drugs from Los Angeles to Florida, and they were concerned over whether her bag would make it onto the flight. Docket No. 345 at 47-48. DEA agents gave this information to law enforcement officers in Florida. *Id*. at 48-49. When Clemons landed in Florida, she went to a hotel and called a phone agents believe to be used by Defendant Harris. *Id*. at 49-50. The person on the phone, whom agents believe to be Defendant Harris, told Clemons to take the "gifts" to a person who was coming to pick them up. *Id*. at 50. Once this transaction occurred, on March 27, 2023, Florida investigators arrested the person picking up the "gifts" and recovered several grams of narcotics, including fentanyl powder, cocaine, and methamphetamine. *Id*. at 50.

Also on March 27, 2023, the undercover DEA agent met with Defendant Hernandez, who sold him two firearms and with co-Defendant Alexandria Henriques, who sold him approximately one pound of methamphetamine. *Id*. at 50-51. Both controlled buys were video recorded. *Id*. at 51-52; Government Exhibit 29 (video recording of controlled buys).

On April 16, 2023, the undercover DEA agent called Defendant McRoyal to arrange to purchase fentanyl pills from him and recorded the call. Docket No. 345 at 52-53; Government Exhibit 30A (audio recording of phone call). On April 17, 2023, the undercover DEA agent texted with Defendant McRoyal to arrange this purchase, and also had a recorded phone call with him. Docket No. 345 at 53-54; Government Exhibits 30B (text messages between agent and Defendant McRoyal) and 30C (audio recording of phone call).

On April 20, 2023, the undercover DEA agent purchased approximately 500 fentanyl pills from Defendant McRoyal in Las Vegas, Nevada. Docket No. 345 at 54. SA Martinez was conducting surveillance during this controlled buy and observed Defendant McRoyal driving a white Chevy van with a California license plate that returned to a business called Just Go, Incorporated or Just Go Enterprises. *Id*. at 54-55.

Also on April 20, 2023, at approximately 1:20 p.m., the DEA intercepted a phone call between Defendants McRoyal and Harris, wherein they were discussing drug trafficking. *Id*. at 55; Government Exhibit 35 (audio recording of phone call). Approximately 40 minutes later, at 2:00 p.m., the DEA intercepted a phone call between Defendants McRoyal and Rosser, wherein they were discussing drug trafficking. Docket No. 345 at 59; Government Exhibit 36 (audio recording of phone call). At approximately 7:13 p.m. that night, the DEA intercepted a phone call between Defendant McRoyal and an unknown caller discussing Defendant McRoyal's current location. Docket No. 345 at 59-61; Government Exhibit 37 (audio recording of phone call). During this call, there was a reference to LA, or Los Angeles, and SA Martinez testified that Phelan, California, which is in the Greater Los Angeles area, is where agents believe that Defendant Harris lived and where the DTO was receiving narcotics. Docket No. 345 at 61; Docket No. 346 at 58-59.

On the same night, April 20, 2023, at approximately 8:24 p.m. and again at approximately 9:20 p.m., the DEA intercepted phone calls between Defendants McRoyal and Harris, wherein the two were discussing Defendant McRoyal's current location. Docket No. 345 at 61-62; Government Exhibits 38, 39 (audio recordings of phone calls). At approximately 10:13 p.m., the DEA intercepted a phone call between Defendants McRoyal and Harris, wherein the two discussed Defendant McRoyal's arrival at Defendant Harris' location. Docket No. 345 at 62-63;

Government Exhibit 40 (recording of phone call). At approximately 11:28 p.m., the DEA intercepted a phone call between Defendants McRoyal and Harris, wherein they discussed Defendant McRoyal's suspicions regarding a vehicle he saw near Defendant Harris' location. Docket No. 345 at 63; Government Exhibit 41 (recording of phone call).

On April 20, 2023, the DEA was monitoring license plate reader devices. Docket No. 345 at 63. Between 11:44 p.m. and 11:57 p.m., these devices captured the white Chevrolet van with the California registration that SA Martinez observed Defendant McRoyal driving that day traveling from Victorville, California toward Interstate 15. *Id*. at 63-64, 65; Docket No. 346 at 14.[3]

On April 21, 2023, shortly after 12:00 a.m., the DEA intercepted a phone call between Defendant McRoyal and an unidentified individual, wherein Defendant McRoyal stated that he was on his way back to Las Vegas and was about 190 miles away. Docket No. 345 at 64-65; Government Exhibit 44 (recording of phone call). This call made SA Martinez believe that agents needed to start putting a plan in place, as they believed Defendant McRoyal was transporting narcotics from California to Las Vegas. *Id*. at 65. SA Martinez testified that Defendant McRoyal was driving the same van he had already used to sell 500 fentanyl pills; he made a quick turnaround from California back to Las Vegas; he told Defendant Rosser he was on his way to pick something up for him; and agents believed Defendant Harris was the source of supply for Defendant McRoyal. *Id*.; Docket No. 346 at 53-55, 57. SA Martinez testified that he had a duty to try to intercept the narcotics, if possible. Docket No. 345 at 65.

---

[3]    The Court cites to the CM/ECF pagination of Docket No. 346, not to the pagination in the transcript itself, which is a continuation of the pagination from Docket No. 345.

SA Martinez then reached out to the Nevada Highway Patrol ("NHP") night sergeant and told him "a good amount of our investigation, including the intercepts." *Id*. at 66; Docket No. 346 at 10, 13-16, 22. SA Martinez gave the sergeant the description of the van and its plate, as well as a description of Defendant McRoyal, who was believed to be driving the van, and the van's current location. Docket No. 345 at 66; Docket No. 346 at 10-11. SA Martinez did not tell the sergeant the specific type of narcotics that he believed may be in the van, though he did tell him that there may be fentanyl so that the troopers could take extra precautions. Docket No. 346 at 17-21. SA Martinez told the sergeant that it's not guaranteed, but highly likely that this vehicle traveling from California to Nevada will have narcotics and asked if Highway Patrol could "help us out, provide maybe a K-9 unit." Docket No. 345 at 66; Docket No. 346 at 12, 20-21. The night sergeant reached out the K-9 sergeant in order to formulate a plan. Docket No. 345 at 66.

SA Martinez contacted Nevada Highway Patrol in order to attempt a wall stop of the van. Docket No. 346 at 11. This type of stop is meant to "wall off" the underlying investigation. *Id*. at 24. SA Martinez did not tell NHP how to conduct the traffic stop, to search the vehicle, or what to look for. *Id*. at 21. Further, he was not in touch with NHP during the stop and did not debrief NHP after the stop. *Id*. at 21, 24. SA Martinez did tell NHP not to arrest either defendant during the stop because he was concerned that an arrest could ruin the T-III investigation. *Id*. at 24.

### B. Testimony of Trooper Auer[4]

---

[4] Trooper Auer is now a police officer in Casa Grande, Arizona. Docket No. 346 at 61. Since he was a Nevada Highway Patrol Trooper at the time of this incident, however, the Court refers to him as Trooper Auer.

Trooper Joshua Auer worked for NHP for over eleven years. *Id*. at 62. He received specialized training both as a K-9 handler and on narcotics investigations. *Id*. at 62-64. While at NHP, he was assigned a K-9 partner named Goldie. *Id*. at 64. As a single-purpose drug detection dog, Goldie was trained to give a behavior on a specific odor, called imprinting, and she and her handler were certified by a third party. *Id*. at 64-67, 91-94. Dogs' noses are significantly more sensitive than humans' noses. *Id*. at 68. Goldie was imprinted with methamphetamine, heroin, and cocaine, meaning she would alert to the odors of any of those specific drugs. *Id*. Goldie was not imprinted to detect any other narcotics, including marijuana. *Id*.

When Goldie smelled one of the odors with which she was imprinted, she gave a passive alert. *Id*. at 69. She had two phases to her alert: initially, she would begin to get excited, "her body would get a little more tense, her wagging would increase, her mouth would close, usually going from an open pant to a closed-mouth sniff, and [Trooper Auer] would her like the crackling or popping of her nose[.]" *Id*. at 69, 79. This alert behavior would demonstrate that she was "really interested in some sort of odor." *Id*. at 69-70. The second phase of Goldie's alert "was a freeze and stare; so her wagging would stop, her body would be rigid, and she would just stare at where she could get closest to that source." *Id*. at 70, 79. When Goldie alerted, it was to the closest place she could get to the source of the narcotics. *Id*. at 79. Trooper Auer testified that air can move throughout a vehicle and odor can come out of the vehicle in multiple different spaces, so Goldie's alert where she smelled the source of the narcotics did not mean that there would be narcotics exactly where she alerted. *Id*. at 82. Goldie would continue staring at the source until Trooper Auer said the word "bingo," which was the marker word that released her from her final response. *Id*. at 70, 80.

On April 21, 2021, Trooper Auer and Goldie were on duty and working with other units. *Id.* Trooper Auer was in uniform, was driving a marked vehicle, and was equipped with a body camera. *Id.* at 70-71; Government Exhibit 45C (Trooper Ayer's bodycam video). Shortly before 2:00 a.m., Trooper Auer was ordered to relocated to Sloan, Nevada, just south of Las Vegas. *Id.* at 71. He was told that a DEA agent was monitoring a vehicle traveling from California after "supposedly" picking up unknown narcotics, and the agent wanted NHP to conduct a wall stop. *Id.* at 71-72.

At approximately 2:10 a.m., Trooper Auer observed the van in question pass the troopers at a high rate of speed, and saw Trooper Moran conduct a traffic stop on the vehicle. *Id.* at 72. While the traffic stop was occurring, Trooper Auer arrived on the scene, went to the vehicle and asked Defendant Hernandez to exit the vehicle, which she did. *Id.* at 73, 75. Trooper Auer then retrieved Goldie and deployed her to conduct a free-air sniff, which meant that he deployed Goldie at the vehicle and Goldie sniffed the air around the vehicle. *Id.* at 73. Specifically, Trooper Auer walked Goldie to the front of the van and gave her the command to start her sniff. *Id.* at 74; Government Exhibit 45C at 5:33. Trooper Auer and Goldie walked around the vehicle in a counterclockwise manner, starting at the driver's side. Docket No. 346 at 74.

While Goldie conducted her sniff, Trooper Auer "let her do her thing and [tried] to have no interaction with her whatsoever other than just holding the leash." *Id.* at 88; Government Exhibit 45C at 5:34-6:05. When they got to the passenger side of the vehicle, Trooper Auer noticed Goldie's initial alert behavior, "she started to become excited; body became rigid; she started sniffing more intently." Docket No. 346 at 74. When Goldie "sniffed along the seam to the front of the passenger door, kind of wheel well area," she gave her final response, "her freeze and stare, showing a positive alert for the odor of narcotics." *Id.* at 74, 79-80, 82, 90; Government

11

Exhibit 45C at 6:03-6:06. This final response indicated that Goldie was signifying the presence of methamphetamine, cocaine, or heroin. Docket No. 346 at 76. Trooper Auer released Goldie, spoke to Defendant Hernandez and asked some questions about her travel, and then told Trooper Moran that Goldie alerted on the vehicle. *Id.* at 74-75, 77, 81.

Defendant Hernandez told Trooper Auer that the van was Defendant McRoyal's cousin's vehicle and that they were coming from his aunt's house. Government Exhibit 45C at 6:57-7:07, 8:32-8:33. Defendant Hernandez said that the aunt lived in Hesperia and that she and Defendant McRoyal had been there for a couple of hours. *Id.* at 7:08-7:18. Defendant Hernandez said that the aunt is in the process of moving and that she and Defendant McRoyal went to her house to help her. *Id.* at 7:18-7:22, 8:40-8:42. Defendant Hernandez said that she and Defendant McRoyal moved "two chairs, a table, and some stuff like that." *Id.* at 7:40-7:46. After Trooper Auer spoke to Defendant Hernandez, he walked by Trooper Moran's vehicle and told him there had been a positive alert on the car. *Id.* at 9:00-9:02.

After Goldie's positive alert, Trooper Auer remained on scene to help the other troopers. Docket No. 346 at 77. While narcotics were later found in Defendants' vehicle, they were not in the wheel well. *Id.* at 83-84, 86.

### C. Testimony of Trooper Moran

Trooper Martin Moran has been employed by NHP for six years. *Id.* at 96. He received primarily interdiction training. *Id.* On April 21, 2023, Trooper Moran was on duty, in uniform, equipped with a body camera, and driving a marked patrol vehicle. *Id.* at 98-99. Shortly before 2:00 a.m., he was instructed to relocate to I-15 northbound just outside of Las Vegas, at mile marker 25. *Id.* at 99-100. Trooper Moran was told that a white Chevy Express van that was

possibly trafficking drugs into Las Vegas or through Nevada would be coming through. *Id*. at 100.

At approximately 2:10 a.m., Trooper Moran observed the van in question approaching from the rear at a high rate of speed. *Id*. at 101. The trooper's rear-facing radar unit clocked the vehicle at 84 miles per hour in a 70 mile-per-hour zone. *Id*. As a result, Trooper Moran effectuated a stop of the vehicle and, when he approached, he saw that the two individuals inside the vehicle were Defendants McRoyal and Hernandez. *Id*. Trooper Moran told the two defendants that he stopped the vehicle for speeding and that he would only issue a written warning, which is something he commonly does while doing interdiction work, in order to put the occupants of the vehicle at ease. *Id*. at 103, 116; Government Exhibits 45A, 45B (Trooper Moran's bodycam video).

Trooper Moran asked Defendant McRoyal, who was the driver of the vehicle, to step out of the vehicle and join him in his patrol car, so that he could issue the written warning. Docket No. 346 at 103-104. In order to write the warning, Trooper Moran had to verify that Defendant McRoyal had a valid driver's license, that his registration and insurance were current and valid, and that his addresses were good. In addition, he conducted records checks to make sure Defendant McRoyal had no outstanding warrants or protective orders that needed to be served and determine if he was missing person. *Id*. at 104, 116. The warning itself required Trooper Moran to fill out Defendant McRoyal's current information and write a brief narrative of the stop itself. *Id*. at 104-105.

Defendant McRoyal told Trooper Moran that he was coming from his aunt's house in Barstow. Government Exhibit 45A at 3:17-3:24, 6:08. Defendant McRoyal said he went to his aunt's house that day because his uncle died. *Id*. at 6:17-6:31. Defendant McRoyal first said his

uncle died because he "got fucked up," then said he had a heart attack or stroke and, when Officer Moran asked, said he had a heart attack stroke. *Id*. at 6:35-6:55. Defendant McRoyal said the van belonged to his cousin's business, his cousin let him drive it, he had had the van for "a while," and he was driving the van because his car broke. *Id*. at 7:30-7:34, 8:19-8:52, 9:27-9:34. Defendant McRoyal said that he had been at his aunt's house that day to help plan his uncle's funeral. *Id*. at 9:04-9:13.

While Trooper Moran was in his vehicle with Defendant McRoyal, Trooper Auer arrived on the scene, made contact with Defendant Hernandez, and had her exit the van. Docket No. 346 at 105. Defendant McRoyal "became extremely fixated" on Trooper Auer, and his conversation with Trooper Moran changed – whereas before, it had been more of a normal conversation, Defendant McRoyal started responding to Trooper Moran's questions with very short answers or answers that did not answer the questions. *Id*. While writing the warning, Trooper Moran asked Defendant McRoyal if he had anything inside his vehicle and Defendant McRoyal said there was approximately a pound of marijuana. *Id*. at 105-106, 118. Trooper Moran knew that that amount was illegal under Nevada law and asked Defendant McRoyal for consent to search the vehicle. *Id*. at 106. When Defendant McRoyal agreed to the search, Trooper Moran provided him with a written consent form. *Id*. at 106-107, 118. Defendant McRoyal refused to sign the consent form, but said the weed's just there, you can go ahead and grab it. *Id*. at 106-107, 118-119. At that point, Trooper Moran believed that Defendant McRoyal was consenting only to the seizure of the marijuana; however, he also knew that Goldie had alerted on the vehicle. *Id*. at 120-121.

Trooper Moran finished writing the warning and had Defendant McRoyal exit his patrol vehicle and stand outside of the van, about 15 feet away from Defendant Hernandez, while troopers conducted a search of the van. *Id*. at 107. The van was set up in a manner that there

14

were two front seats, and they were separated from the cargo compartment by a cage. *Id.*; Government Exhibit 45A at 17:35. Troopers started their search in the cargo area, where Trooper Moran first found a bag of marijuana. Docket No. 346 at 108, 121. Then, at the front of the cargo area, right behind the passenger seat, he found a small gaming box. *Id*; Government Exhibit 45A at 19:40-20:50. When Trooper Moran picked up the gaming box, he noticed that it was heavier than it should be and, upon opening the box, he found over 900 grams of methamphetamine, over 100 grams of pills believed to be fentanyl at the time, approximately 56 grams of cocaine, approximately 67 grams of a brown powdery substance, and approximately 60 grams of a light blue powdery substance. Docket No. 346 at 108, 113, 122-124.

After recovering the drugs, troopers continued their search of the van. *Id*. at 114, 125-126. Trooper Moran testified that narcotics are often hidden inside voids or compartments of vehicles and placed into containers in vehicles, as well. *Id*. As a result, during the search, troopers checked all the voids, compartments, and containers in the vehicle. *Id*. at 114, 121. After the search was over, Trooper Moran provided both defendants with a *Markham* notice, which is a notice that they may face prosecution. *Id*. at 115, 127-128. Trooper Moran did not arrest either defendant that day, and both defendants were allowed to return to the van and drive away from the scene without any restrictions. *Id*. at 115-116. Approximately an hour passed between the time the van was pulled over and the time the defendants left the scene after the search. *Id*. at 131-133.

## II.   ANALYSIS

### A.   Credibility of Witnesses

The Court ordered an evidentiary hearing in order to make an accurate determination of what occurred in the instant case and how the facts relate to the applicable caselaw. "The

longstanding and repeated invocations in caselaw of the need of district courts to hear live testimony so as to further the accuracy and integrity of the factfinding process are not mere platitudes.   Rather, live testimony is the bedrock of the search for truth in our judicial system." *United States v. Thoms*, 684 F.3d 893, 903 (9th Cir. 2012).   "[J]udges simply cannot decide whether a witness is telling the truth on the basis of a paper record and must observe the witnesses' demeanor to best ascertain their veracity - or lack thereof." *Oshodi v. Holder*, 729 F.3d 883, 892 (9th Cir. 2013) (internal citation omitted). *See also United States v. Howell*, 231 F.3d 615, 621 (9th Cir. 2000) (evidentiary hearing required where defendant demonstrates that a significant disputed factual issue exists); *United States v. Mejia*, 69 F.3d 309, 315 (9th Cir. 1995) ("There can be no doubt that seeing a witness testify live assists the finder of fact in evaluating the witness's credibility").

During the evidentiary hearing in this matter, the Court had the opportunity to listen to the testimony of all witnesses, to observe and evaluate each witness' demeanor while testifying, and to weigh each witness' credibility.   Having done so, the Court finds that Agent Martinez, Trooper Auer, and Trooper Moran testified credibly.

### B.    Motion to Suppress

Defendants McRoyal and Hernandez ask the Court to suppress all evidence that was seized during the April 21, 2023, traffic stop conducted by the NHP.   Docket No. 277. Specifically, Defendants submit that DEA agents coordinated with the NHP to conduct a pretextual stop of the vehicle and stopped the vehicle, driven by Defendant McRoyal, for speeding.[5] *Id*. at 1. Defendants submit that Defendant McRoyal admitted he had approximately

---

[5]    Defendant Hernandez was the passenger and only other person in the vehicle and was seated in the front passenger seat of the van.

one pound of marijuana in the van, and consented to the trooper searching the entire vehicle, bumper to bumper. *Id*. at 2. Defendants further submit that, when the trooper asked Defendant McRoyal to sign a consent form, he withdrew his consent to search the entire vehicle and consented only to the search and seizure of the marijuana. *Id*. Defendants submit that, after removing the marijuana from the vehicle, the remaining search of the vehicle was illegal, as Defendants did not consent to it, no search warrant was obtained, and the search unreasonably prolonged the mission of the stop. *Id*. at 2-3. Defendants therefore ask this Court to suppress all evidence that was seized after the marijuana. *Id*. at 3.[6]

In response and supplemental briefing, the United States submits that the stop was a wall stop based on information obtained by law enforcement from wiretap conversations, which information constituted probable cause for the search. Docket No. 282 at 13; Docket No. 351 at 10-11. The United States submits that, since the stop was a wall stop, the search did not unnecessarily prolong the mission of the stop. Docket No. 282 at 21-22. The United States submits that the stop was not prolonged, as the mission of the traffic stop included verifying Defendant McRoyal's driver's license, the vehicle's registration and insurance, checking whether Defendnt McRoyal had any warrants, and writing the citation. Docket No. 351 at 7. The United States submits that, while Trooper Moran completed these activities, Defendant McRoyal admitted he had marijuana in the van and Trooper Moran learned that Trooper Auer K-9 alerted on the vehicle for narcotics. *Id*. at 7-8. Therefore, the United States submits, the probable cause to search the van arose prior to the completion of the original mission of the stop. *Id*. at 8. In any event, the United States submits, the troopers had probable cause to search the vehicle even

---

[6]     In her joinder, Defendant Hernandez additionally challenges the initial vehicle stop, though she cites to no authority to support her argument. Docket No. 280 at 2.

before it was stopped because of the information from the wiretaps and, since the mission of the stop was a wall stop, the search did not prolong the mission of the stop. *Id*. at 11-12.

The United States further submits that, even without the wiretap information, the stop was proper because Defendant McRoyal was speeding and the positive alert from the trained drug-sniffing dog constituted probable cause to search the van without a warrant. Docket No. 282 at 13-14, 25; Docket No. 351 at 4-5. The United States submits that, since Goldie was certified by a bona fide organization and alerted on the vehicle, her alert provides probable cause to search the van. *Id*. at 4. The United States further submits that Defendant McRoyal's admission that he possessed a pound of marijuana inside the van increased the troopers' probable cause to search the entire van. *Id*. at 6. Additionally, since Trooper Auer's K-9 was trained to detect only the odor of methamphetamine, heroin, and cocaine, the United States submits that the discovery of the marijuana in the van had no bearing on the probable cause analysis regarding the dog sniff. *Id*. at 7.

The United States submits that, although probable cause existed, Defendant McRoyal gave the troopers consent to search the entire van and never withdrew his consent. Docket No. 282 at 14, 25-26; Docket No. 351 at 8-10. The United States notes that Trooper Moran asked Defendant McRoyal if the troopers could "search [the van] bumper to bumper and make sure there's nothing illegal" in the van and Defendant McRoyal responded, "[y]eah." Docket No. 351 at 8. This response, submits the United States, constitutes unequivocal and specific consent to search the entire van. *Id*. The United States submits that Defendant McRoyal's reluctance to sign the written consent form and statement that the troopers can grab the marijuana fails to

18

withdraw his prior unambiguous consent. *Id*. at 8-9.[7] The United States points out that Defendant told Trooper Moran the troopers "could search the van bumper to bumper, he never told the troopers they could only look in the location with the marijuana, and he never told them to stop searching." *Id*. at 9.

Finally, the United States submits that Defendant Hernandez lacks standing to challenge the search of the van. Docket No. 282 at 14, 25-26; Docket No. 351 at 2-3. Therefore, the United States asks the Court to deny the motion to suppress. Docket No. 282 at 27; Docket No. 351 at 12-13.

In reply, Defendant Hernandez submits that she has standing to challenge the search of the vehicle. Docket No. 294 at 1-3. Defendants submit that the search of the vehicle, after the retrieval of the marijuana, unreasonably prolonged the mission of the traffic stop. Docket No. 301 at 1-4, 8-9. Defendants further submit that the positive dog alert and recovery of the marijuana did not justify the prolonged stop. Id. at 5–7. Finally, Defendants submit that Defendant McRoyal narrowed his consent to just the marijuana after the trooper presented him with the written consent form. *Id*. at 7-8.

In his supplemental briefing, Defendant McRoyal submits that the collective knowledge doctrine does not apply and, therefore, the wall stop fails as a matter of law. Docket No. 355 at 5. Defendant McRoyal submits that SA Martinez did not provide information regarding the specifics of the investigation to Troopers Moran and Auer. *Id*. at 5-6. Instead, Defendant McRoyal submits, SA Martinez "made only a generalized request that NHP conduct a traffic stop

---

[7]   Trooper Moran testified that he believed Defendant McRoyal limited his consent to the marijuana after giving consent to search the entire van; however, the United States submits that the trooper's subjective belief is irrelevant, as the Fourth Amendment looks to objective reasonableness. Docket No. 351 at 9.

if a violation occurred," conceded that he did not know whether narcotics would be present in the vehicle, and "his suspicion amounted to little more than a belief that [Defendant McRoyal] was driving the same van he had used earlier in the day." *Id*. at 6. Defendant McRoyal submits that the stop was initiated solely for his speeding and was, therefore, treated as a routine traffic matter. *Id*.

Defendant McRoyal further submits that, as the collective knowledge doctrine does not apply, the mission of the stop ended after he was given the written speeding warning, and the marijuana was recovered from the van. *Id*. at 7. Therefore, Defendant McRoyal submits, the troopers unreasonably prolonged the stop when they searched his van. *Id*.

Defendant McRoyal further submits that the dog sniff does not establish probable cause for the search of the van. *Id*. Defendant McRoyal submits that the dog alerted on the front passenger side wheel well which "is an area far removed from where the narcotic were ultimately discovered." *Id*. Defendant McRoyal submits that the dog walked past the area where the narcotics were and did not alert to it, which undermines any determination of probable cause. *Id*. at 8. Defendant McRoyal further states, with no elaboration or citation, that "the circumstances raise legitimate concerns about handler cueing or expectation bias." *Id*. Defendant McRoyal submits that the troopers knew that they had been asked by a federal agency to stop the vehicle and, therefore, "it was an easy, and dangerous, leap to assume drugs were present." *Id*.

Finally, Defendant McRoyal submits that the search of the vehicle exceeded the scope of his limited consent. *Id*. Defendant McRoyal submits that, although he initially agreed to a bumper-to-bumper search of the vehicle, he narrowed that consent to the pound of marijuana that he admitted to possessing in the vehicle. *Id*. Defendant McRoyal concedes that the marijuana he possessed was above the legal limit; however, he submits that no indication exists that he

20

possessed the marijuana for anything other than personal use. *Id*. at 9. Therefore, Defendant McRoyal submits that any search after the marijuana was recovered was illegal. *Id*. As a result, Defendant McRoyal asks the Court to suppress the narcotics that were seized from the vehicle after the marijuana was found. *Id*. at 10.

### 1.  Standards

The Fourth Amendment protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." *Torres v. Madrid*, 592 U.S. 306, 311 (2021). Traffic stops, "even if only for a brief period and for a limited purpose," are "seizures" within the meaning of the Fourth Amendment, and therefore are "subject to the constitutional imperative that (they) not be 'unreasonable' under the circumstances." *Whren v. United States*, 517 U.S. 806, 810 (1996); *see also United States v. Arvizu*, 534 U.S. 266, 273 (2002); *United States v. Colin*, 314 F.3d 439, 442 (9th Cir. 2002) ("The Fourth Amendment's prohibition against unreasonable searches and seizures applies to investigatory traffic stops."). "A police-initiated traffic stop is reasonable under the Fourth Amendment if the police stop the vehicle because of a 'reasonable suspicion' that the vehicle's occupants have broken a law." *United States v. Hartz*, 458 F.3d 1011, 1017 (9th Cir. 2006); *United States v. Lopez-Soto*, 543 F.3d 1080, 1087-1088 (9th Cir. 2008). An officer making a traffic stop "must have a particularized and objective basis for suspecting the particular person stopped of criminal activity." *United States v. Cortez*, 449 U.S. 411, 417-18 (1981); *see also United States v. Valdes-Vega*, 738 F.3d 1074, 1078 (9th Cir. 2013) (en banc).

In the context of an investigatory traffic stop, an officer need only have reasonable suspicion to justify the seizure. *See United States v. Lopez–Soto,* 205 F.3d 1101, 1104–05 (9th Cir. 2000) (*Whren* did not alter the well-settled law that reasonable suspicion is enough to support

an investigatory traffic stop under the Fourth Amendment); *Brendlin v. California,* 551 U.S. 249, 263 (2007) (seizure began at the moment the car came to a halt on the side of the road). Reasonable suspicion requires "specific, articulable facts which, together with objective and reasonable inferences, form the basis for suspecting that the particular person detained is engaged in [a traffic violation]." *United States v. Michael R.,* 90 F.3d 340, 346 (9th Cir. 1996) (quoting *United States v. Garcia–Camacho,* 53 F.3d 244, 246 (9th Cir. 1995)).

The reasonable suspicion standard is intentionally abstract, and courts are to give "due weight" to the factual inferences drawn by law enforcement officers. *Arvizu*, 534 U.S. at 273-77; *see also United States v. Edwards*, 761 F.3d 977, 983 (9th Cir. 2014) ("Reasonable suspicion 'is dependent upon both the content of information possessed by police and its degree of reliability,' and '(t)he standard takes into account the totality of the circumstances—the whole picture.' "); *Hartz*, 458 F.3d at 1017 ("Reasonable suspicion exists if 'specific, articulable facts ... together with objective and reasonable inferences' suggest that the persons detained by the police are engaged in criminal activity"). The reasonable suspicion standard is "not a particularly high threshold to reach." *United States v. Valdes-Vega*, 738 F.3d 1074, 1078 (9th Cir. 2013 (en banc). Reasonable suspicion requires more than a mere hunch but it requires "considerably less than proof of wrongdoing by a preponderance of the evidence, and obviously less than is necessary for probable cause." *Kansas v. Glover*, 589 U.S. 376, 380 (2020). Reasonable suspicion "is dependent upon both the content of information possessed by police and its degree of reliability." *United States v. Edwards*, 761 F.3d 977, 983 (9th Cir. 2014) (internal citation omitted).

"A seizure for a traffic violation justifies a police investigation of that violation." *Rodriguez v. United States*, 575 U.S. 348, 354, 135 S.Ct. 1609, 191 L.Ed.2d 492 (2015). "Under

the Fourth Amendment, a seizure for a traffic stop is 'a relatively brief encounter,' 'more analogous to a so-called *Terry* stop than to a formal arrest.'" *United States v. Taylor*, 60 F.4th 1233, 1239 (9th Cir. 2023) (quoting *Rodriguez*, 575 U.S. at 354, 135 S.Ct. 1609). "To be lawful, a traffic stop must be limited in its scope: an officer may 'address the traffic violation that warranted the stop,' make 'ordinary inquiries incident to the traffic stop,' and 'attend to related safety concerns.'" *Id.* (quoting *Rodriguez*, 575 U.S. at 354–55, 135 S.Ct. 1609). "The stop may last 'no longer than is necessary to effectuate' these purposes and complete the traffic 'mission' safely." *Id.* (quoting *Rodriguez*, 575 U.S. at 354–55, 135 S.Ct. 1609).

Lawful inquiries incident to a traffic stop can include checking a driver's license, determining whether there are outstanding warrants, and inspecting the automobile's registration and proof of insurance. *See United States v. Ramirez*, 98 F.4th 1141, 1144 (9th Cir. 2024). Attending to related safety concerns includes "certain negligibly burdensome precautions in order to complete [the traffic] mission safely," such as ordering the driving of a vehicle "to exit the vehicle during a traffic stop." *Id.* These safety precautions fall within the mission of the traffic stop because "[t]raffic stops are 'especially fraught with danger to police officers.'" *Rodriguez*, 575 U.S. at 356 (quoting *Arizona v. Johnson*, 555 U.S. 323, 330 (2009)).

A traffic stop "can become unlawful if it is prolonged beyond the time reasonably required to complete the mission" of the stop." *United States v. Hylton*, 30 F.4th 842, 847 (9th Cir. 2022) (quoting *Rodriguez*, 575 U.S. at 354). An officer may, however, engage in certain unrelated investigations that do not lengthen the roadside detention. *Rodriguez*, 575 U.S. at 354. Nonetheless, "a stop 'may be extended to conduct an investigation into matters other than the original traffic violation' so long as 'the officers have reasonable suspicion of an independent

offense.'" *United States v. Steinman*, 159 F.4th 550, 561 (9th Cir. 2025) (quoting *Taylor*, 60 F.4th at 1239).

"In assessing whether a detention is too long in duration to be justified as an investigative stop," it is proper "to examine whether the police diligently pursued a means of investigation that was likely to confirm or dispel their suspicions quickly." *United States v. Sharpe*, 470 U.S. 675, 686 (1985). Ultimately, the analysis remains one of reasonableness, and thus the court must examine the "totality of the circumstances" surrounding the stop to determine whether the length is reasonable. *See United States v. Turvin*, 517 F.3d 1097, 1101 (9th Cir. 2008).

Police may "conduct a warrantless search of a vehicle if they have probable cause to believe that it contains contraband." *United States v. Fowlkes*, 804 F.3d 954, 971 (9th Cir. 2015) (quoting *United States v. Pinela-Hernandez*, 262 F.3d 974, 977–78 (9th Cir. 2001)); *see also California v. Acevedo*, 500 U.S. 565, 569 (1991) (citing *Carroll v. United States*, 267 U.S. 132, 151 (1925)). Probable cause exists when "the known facts and circumstances are sufficient to warrant a [person] of reasonable prudence in the belief that contraband or evidence of a crime will be found." *Ornelas v. United States*, 517 U.S. 690, 696 (1996). This "requires only a probability or substantial chance of criminal activity, not an actual showing of such activity." *Illinois v. Gates*, 462 U.S. 213, 243 n.13 (1983). Officers may rely on their specialized knowledge and training to draw inferences from their observations. *United States v. Arvizu*, 534 U.S. 266, 273 (2002). When officers are acting in concert, the Ninth Circuit instructs courts to "look[ ] to the collective knowledge of all officers involved in the criminal investigation." *Fowlkes*, 804 F.3d at 971 (quoting *United States v. Ramirez*, 473 F.3d 1026, 1032–37 (9th Cir. 2007)).

At least two different situations exist where courts have applied the collective knowledge doctrine. *Ramirez*, 473 F.3d at 1032. The first situation involves law enforcement agents who are working together on an investigation "but have not explicitly communicated the facts each has independently learned." *Id*. Application of the collective knowledge doctrine has "sparked disagreement" in this type of situation, "perhaps because no single law enforcement officer knows all of the facts necessary to establish reasonable suspicion or probable cause, and thus aggregation of facts is required." *Id*. The second situation in which the collective knowledge doctrine applies is "where an officer (or team of officers), with direct personal knowledge of *all* the facts necessary to give rise to reasonable suspicion or probable cause, directs or requests that another officer, not previously involved in the investigation, conduct a stop, search, or arrest." *Id*. at 1033 (emphasis in original). The collective probable cause of the other officers transfers to the arresting or searching officer who relies on an instruction delivered by other officers possessing probable cause. *Id*. at 1036.

When a court applies the collective knowledge doctrine to a search occurring during a traffic stop, "the question is no longer whether there was a violation of traffic laws but, instead, whether there was probable cause for the search." *United States v. Hicks*, 2025 WL 2779980, at *4 (EDCA, Sept. 30, 2025) (citing *Ramirez*, 473 F.3d at 1030-1031). "[T]he collective knowledge doctrine includes no requirement regarding the *content* of the communication that one officer must make to another." *United States v. Tapia-Baltazar*, 2025 WL 3240901, at *4 (D. Idaho Nov. 20, 2025) (citing Ramirez, 473 F.3d at 1037) (emphasis in original). "Where one officer knows facts constituting reasonable suspicion or probable cause (sufficient to justify action under an exception to the warrant requirement), and he communicates an appropriate order or request, another officer may conduct a warrantless stop, search, or arrest without violating the

25

Fourth Amendment." *United States v. Takatsy*, 2018 WL 3221598, at *9 (D. Ariz. July 2, 2018) (citing *Ramirez*, 473 F.3d at 1037).

"The standard for determining whether probable cause or reasonable suspicion exists is an objective one; it does not turn either on the subjective thought processes of the officer or on whether the officer is truthful about the reason for the stop." *United States v. Magallon-Lopez*, 817 F.3d 671, 675 (9th Cir. 2016). "If, for example, the facts provide probable cause or reasonable suspicion to justify a traffic stop, the stop is lawful even if the officer made the stop only because he wished to investigate a more serious offense." *Id.* (citing *Whren v. United States*, 517 U.S. 806, 812-13 (1996)). "Likewise, if the facts support probable cause to arrest for one offense, the arrest is lawful even if the officer invoked, as the basis for the arrest, a different offense as to which probable cause was lacking." *Id.* (citing *Davenpeck v. Alford*, 543 U.S. 146, 153-55 (2004)).

## 2. Analysis

Here, the totality of the circumstances clearly demonstrate that the stop and search of the vehicle were lawful.[8] The DEA's investigation included controlled buys of narcotics and

---

[8] The parties argue over whether Defendant Hernandez has standing to contest the search of the vehicle. *See* Docket Nos. 280, 282, 294, 351.

To have Fourth Amendment "standing" to "contest the legality of a search or seizure, the defendant must establish that he had a 'legitimate expectation of privacy' in the place searched or in the property seized." *United States v. Kovac*, 795 F.2d 1509, 1510 (9th Cir. 1986) (emphasis added) (citation omitted). Defendant has the burden of establishing standing, not the United States. *United States v. Singleton*, 987 F.2d 1444, 1449 (9th Cir. 1993) (defendant's burden of proof as established by the Supreme Court); *United States v. Hull*, 2022 WL 2921000, at *2 (E.D. Wash. July 25, 2022).

As a passenger with no possessory or ownership interest in the vehicle, Defendant Hernandez "has no reasonable expectation of privacy in a car that would permit" her Fourth Amendment challenge to a search of the car. *United States v. Pulliam*, 405 F.3d 782, 786 (9th Cir. 2005) (internal citations omitted); *United States v. Twilley*, 222 F.3d 1092, 1095 (9th Cir.

firearms from Defendants McRoyal and Hernandez and their co-defendants, as well as intercepted phone calls that discussed trafficking in narcotics and indicated that the purpose of the trip to California was to obtain narcotics from Defendant Harris, a determination that the van was near property owned by Harris, and license plate readings showing the van's location at several points during the trip. These facts, taken together are clearly sufficient to cause a person of reasonable prudence to believe that narcotics would be found in the van that night. Therefore, probably cause clearly existed. Further, under the collective knowledge doctrine, NHP clearly had reasonable suspicion to stop the vehicle and probable cause to search. *See United States v. Magallon-Lopez*, 817 F. 3d 671, 674 (9th Cir. 2016). Nonetheless, Defendant McRoyal was admittedly speeding and was stopped for speeding.

Defendant McRoyal argues that the collective knowledge doctrine does not apply here because, he submits, SA Martinez did not provide specific facts establishing probable cause to Trooper Moran or Trooper Auer; rather, he "made only a generalized request that NHP conduct a traffic stop if a violation occurred … [and] conceded that he did not know whether drugs were present in the vehicle[.]" Docket No. 355 at 5-6. Defendant McRoyal's interpretation of the collective knowledge doctrine, however, is incorrect. The caselaw clearly states that, when an officer (or group of officers) with probable cause directs another law enforcement officer to stop

---

2000). *See also United States v. Pineda*, 2023 WL 3276467, at *5 (D.Nev. May 4, 2023) (passenger of vehicle does not have possessory interest in car).

Nonetheless, if Defendant Hernandez could establish that the initial stop of the car violated the Fourth Amendment, then the evidence that was seized as a result of that stop would be subject to suppression as 'fruit of the poisonous tree.'" *Twilley*, 222 F.3d at 1095.

As the Court has found that the stop was lawful, the Court finds that Defendant Hernandez, as a passenger in the vehicle, does not have standing to seek suppression of the evidence that was recovered from the vehicle.

and/or search a vehicle, the collective knowledge doctrine applies and does not require more specific language.[9]  Further, probable cause requires only a probability or substantial chance of criminal activity, not an actual showing of such activity.  As a result, the fact that SA Martinez believed that narcotics would be found in the van, but told the NHP night sergeant and the Court that he could not guarantee the presence of the narcotics does not negate the probable cause based on the totality of the circumstances.  Therefore, the Court finds that sufficient probable cause existed to stop and search the van driven by Defendant McRoyal.

Even if the troopers had not had probable cause to search the vehicle prior to stopping it, which the Court finds they did, probable cause was established after it was stopped.  Defendants McRoyal and Hernandez gave different answers to the troopers about the purpose of their trip. Defendant Hernandez told Trooper Auer that they visited Defendant McRoyal's aunt to help her move and that they had moved some pieces of furniture for her.  Defendant McRoyal, however, told Trooper Moran that the purpose of the trip was to help his aunt plan his uncle's funeral.  In addition, the drug-sniffing dog – who is trained to sniff cocaine, heroin, and methamphetamine, not marijuana – alerted on the vehicle, indicating that at least one of those narcotics was present.[10] The Court finds that probable cause was again established, under the totality of the circumstances, after the stop.  Since the troopers had probable cause to search the van, the Court finds that the

---

[9]    Despite the fact that, under the law, SA Martinez did not need to provide specific facts for the collective knowledge doctrine to apply, SA Martinez testified that he provided specifics of the investigation to the NHP night sergeant when he asked NHP to stop and search the van.

[10]    At the hearing, Defendants were concerned that the dog alerted at the front passenger wheel well of the vehicle and the narcotics were found inside the vehicle.  Trooper Auer explained that odors travel in a vehicle and the dog alerted to the closest area where she smelled the odors.  Further, in the video, it was clear that the box of narcotics was located directly behind the front passenger seat, which is not far from the front passenger wheel well.

troopers diligently conducted the mission of the stop and, therefore, did not prolong the stop. Looking at the totality of the circumstances, the Court finds that the troopers had probable cause to believe that illegal narcotics (in addition to the marijuana to which Defendant McRoyal admitted) were present in the vehicle.[11] *See Magallon-Lopez*, 817 F. 3d at 676.

### III.   ORDER AND RECOMMENDATION

Based on the foregoing and good cause appearing therefore,

IT IS ORDERED that Defendant Hernandez's motion for joinder, Docket No. 280, is **GRANTED** to the extent that she is allowed to join Defendant McRoyal's motion to suppress; however, the Court finds that, as the stop was lawful, Defendant Hernandez does not have standing to contest the search of the vehicle.

IT IS RECOMMENDED that Defendants' motion to suppress evidence, Docket No. 277, be **DENIED**.

DATED: February 10, 2026.

NANCY J. KOPPE
UNITED STATES MAGISTRATE JUDGE

### NOTICE

This report and recommendation is submitted to the United States District Judge assigned to this case pursuant to 28 U.S.C. § 636(b)(1). A party who objects to this report and recommendation must file a written objection supported by points and authorities within fourteen

---

[11] The Court need not reach the issue of whether Defendant McRoyal narrowed his consent, as the Court finds that probable cause existed to search the entire vehicle.

days of being served with this report and recommendation. Local Rule IB 3-2(a). Failure to file a timely objection may waive the right to appeal the district court's order. *Martinez v. Ylst*, 951 F.2d 1153, 1157 (9th Cir. 1991).